**Application of Charles AYME De La CHEVRELIERE.**

**Patent Appeal No. 9093.**

United States Court of Customs and Patent Appeals.

Oct. 25, 1973.

Arthur O. Klein, New York City, attorney of record, for appellant, Alfred W. Vibber, New York City, of counsel.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents. Jere W. Sears, Washington, D.C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and LANE, Associate Judges, and ALMOND, Senior Judge.

ALMOND, Senior Judge.

This is an appeal from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of claims 4 and 5 of appellant's application,[1] entitled "Automatic Soil Sprinkling Arrangement" on the ground that they were obvious within the meaning of 35 U.S.C. § 103. We reverse.

### The Invention

Appellant's invention relates to an automated system for soil irrigation. According to the specification, soil will dry out to a depth at which permanently moist conditions are encountered. Once the soil dries out, the dry layer acts as a barrier to moisture rising by capillary action from the permanently moist zone into the zone of dryness. Therefore, if the soil is irrigated without completely wetting the dry zone, it dries out at a faster rate and must be more frequently irrigated than would be the case had the soil been wet down to the permanently moist zone.

The general nature of appellant's invention can be seen from the following excerpt taken from the specification:

My invention has therefore for its object an arrangement controlling the sprinkling operation and comprising two electrodes measuring the electric resistivity and consequently the moisture of the ground, the novelty of the invention consisting in that the two electrodes are laid at different depths and are preferably spaced in a transverse direction, the upper electrode extending in the layer of soil adapted to be moistened by surface sprinkling while the lower electrode lies at a greater depth within the layer of soil carrying a residual moisture in a manner such that the operation of the sprinkler is controlled and continued until the layer of the soil moistened by the sprinkling sinks down to the layer carrying a residual moisture and enclosing the deeper electrode, which allows restoring continuity of the hygrometric condition of the soil.

The rejected claims, which are directed to systems for achieving the aforementioned object, read as follows:

4. A soil moistening system, comprising in combination a first isolated electrode, in an upper layer of the soil which is adapted to be moistened, a second isolated electrode in a lower layer of the soil which incorporates a permanent residual moisture, means for measuring the electrical resistivity of the soil between said electrodes and thereby the moisture content of the soil when said electrodes are connected to a source of electric power, said means being operatively connected to the actuating means of a sprinkler system and being adapted to activate said sprinkler system until the moisture in said upper layer has sunk sufficiently for it to reach the upper surface of the lower soil layer which incorporates permanent residual mois-

---

1. Serial No. 713,645 filed March 18, 1968.

ture, said first and second electrodes being substantially spaced from each other in a horizontal direction.

5. A soil moisture detecting system, comprising in combination, a first isolated electrode in an upper layer of the soil which is adapted to be moistened, a second isolated electrode in a lower layer of the soil which incorporates a permanent residual moisture, a source of electric power adapted to be connected to said electrodes thereby causing an electric current to flow therethrough and through the soil disposed therebetween, means for measuring the electrical resistivity of the soil between said electrodes thereby measuring the moisture content of the soil, said first and second electrodes being substantially spaced from each other in a horizontal direction.

A system upon which these claims read can be better understood by reference to Figs. 1 and 2 of appellant's application:

[A8293]

[A8294]

Fig. 1 represents an automated irrigation system acknowledged by appellant to be old in the art. In it, electrodes 1 and 2 are buried in the soil at a predetermined depth. When the layer of soil B is dry, no current or very weak cur-

rent passes between the electrodes. This condition is sensed by means 3 which transmits a signal through leads 4 and 5 to a sprinkler not shown. When the sprinkling wets the soil down to the electrodes, a current will pass between the electrodes. This is sensed by means 3 which transmits a signal shutting off the sprinkler. This leaves a dry zone C between zone B and the permanently moist zone A.

Fig. 2 differs from Fig. 1 in two important particulars. First, it will be noted that electrodes 6 and 7 are vertically rather than horizontally displaced from each other. Secondly, electrode 7 is buried in the zone of permanent moisture. Therefore, when the soil dries out, irrigation will be initiated as described for Fig. 1. However, it will continue until the dry soil is wet down to zone A.

The arrangement in Fig. 2 has one shortcoming. In an actual use situation, the soil is not homogeneous. Thus, if one electrode is placed directly over the other, as shown in Fig. 2, the cross-section of the soil between the electrodes may not be representative of the major portion of the soil to be irrigated. To avoid this, appellant's specification indicates that the electrodes 6 and 7 should be further displaced from each other in a horizontal direction as well as vertically. Claims 4 and 5 read upon such an arrangement.

### Rejection

The examiner's rejection of the claims under § 103 was based upon the following references:

| Mercer | 3,195,816 | July 20, 1965 |
| Ames (French) | 1,177,789 | December 8, 1958 |

Mercer describes an automated soil sprinkling system corresponding to that shown in Fig. 1 of appellant's application and acknowledged by appellant to be prior art. Ames describes a rod structure designed to be inserted into the soil. The rod has a number of electrodes disposed along its length which indicate the moisture content of the soil

at different levels. Fig. 1 of that patent shows such a structure and is reproduced below:

FIG. 1

[A8295]

Elements 12 are moisture-sensing cells comprising a pair of electrodes spaced apart from each other within the cell. Each cell and its pair of electrodes are insulated from the others disposed along the rod. The electrodes within the cell are surrounded by a hygroscopic material whose electrical conductivity or resistivity varies according to its moisture content. Its moisture content is determined by that of the surrounding soil. The electrodes are connected to a battery powered ohmmeter, designated 60. The output of the battery is connected across the electrodes of the cell. The amount of current that flows between the electrodes is dependent upon the conductivity or resistivity of the hygroscopic material, usually gypsum. The conductivity or resistivity is itself dependent upon the moisture content of the material. By sequentially reading the conductivity or resistivity of the cells, a profile of soil moisture can be obtained.

In his Answer, the examiner justified his rejection in the following way:

The issue in this appeal is simply whether or not it would be obvious to vary the depth of the electrodes 14 and 15 of Mercer in view of the teaching of Ames which discloses electrodes at varying depths. The secondary reference merely shows electrodes at different depths and even without such showing it would be obvious to the Examiner to place either one or both of the electrodes 14 and 15 at any depth so as to provide for more ground moisture. With the Mercer reference clearly showing all of the elements which produce the same results as Appellant's device the mere relocation of the electrodes cannot be a patentable invention.

The statements by appellant that Mercer cannot obtain the results of appellant's device are mere statements without fact and are not supported by any proof. Furthermore, a person installing the electrodes of Mercer could conceivably, and most probably would, have one electrode somewhat lower than the other and would meet the broad terms of the claims.

In affirming the rejection, the board made the following observations:

The appellant notes that the appealed claims define that one electrode is disposed in an upper layer of the soil which is adapted to be moistened and the second electrode is disposed in a lower layer of the soil which incorporates a permanent residual moisture. The appellant also notes that the first and second electrodes are further defined as being substantially spaced from each other in a horizontal direction. In the appellant's opinion, Ames, like Mercer, can measure the electrical resistance of only a single thickness or layer of the soil and thus neither of the patents, nor their proposed combination, discloses a system such as that defined in the appealed claims.

Mercer clearly discloses two electrodes which are horizontally spaced in the soil to give a determination of the moisture between the electrodes and the use of this determination to control a sprinkler system. Ames

clearly discloses moisture measuring elements 12 which include vertically spaced electrodes 19 and 20. In our opinion, it would be obvious to one skilled in the art to space the electrodes of Mercer in a vertical direction in view of the teaching of Ames who measures the moisture between vertically spaced electrodes.

### Opinion

We have set forth at length portions of the examiner's and board's reasoning concerning the propriety of the rejection made under § 103. In our view, neither sets forth a sufficient legal basis for the rejection made.

The gists of both their positions are essentially the same, i. e., in view of Ames it would be obvious to locate one electrode shown by Mercer at a depth lower than the other. The examiner went so far as to say that a mere relocation of one of these electrodes could not be patentable.

The error committed by both the examiner and the board is that they ignored a critical limitation in the claims. As appellant has continuously urged, his claims require more than a simple relocation of one of the electrodes shown by Mercer. Instead, one electrode must be placed in a permanently moist zone while the other must be located in a zone susceptible to drying out.

Therefore, even though we were to agree that it would be obvious to verti-cally displace one of the electrodes shown by Mercer, it does not follow that it would have been obvious to arrange the electrodes in the manner required by the claims. We think this conclusion is supported by the record. In the first place, neither Ames nor Mercer discusses the existence of a permanently moist zone. Furthermore, Mercer indicates that the electrodes can be located in the soil at any level from the surface down to root depth. Apparently, the latter extreme would insure that the roots receive adequate moisture. However, appellant's specification states that the permanently moist zone lies below root depth. Neither the examiner nor the board has challenged the accuracy of this statement.

In view of this teaching by Mercer, we must assume that one skilled in the art would not be led to arrange the electrodes in a manner contrary to that disclosed by the reference, i. e. so that at least one electrode is below root level and in the permanently moist zone. Certainly Ames does not provide such a suggestion because that reference is also silent on the relationship between the permanently moist zone and a zone susceptible to drying out.

For these reasons, we conclude that claims 4 and 5 would not have been obvious at the time the invention was made. The solicitor's brief does not persuade us otherwise. Accordingly, the board's decision is reversed.

Reversed.